### BENJAMIN NOYES v. STATE.

1. The objection of duplicity to the charge in the indictment must, by force of the fifty-third section of the criminal procedure act, be taken before the jury are sworn.

2. An indictment charging a single conspiracy to commit two or more crimes would not be open to the exception of being double.

3. When a conspiracy occurs in a foreign jurisdiction, and one of the conspirators comes in person into this state, and here, in pursuance of the conspiracy, takes possession of certain property, and the innocent agents of another of such conspirators are present, assisting in such transfer, in legal intendment both such conspirators are present in this state, and by such transaction such conspiracy is here so renewed as to give the courts of this state cognizance of such crime.

4. Testimony is sometimes admissible at the discretion of the court.

5. If an exception to a judge's charge embrace several legal propositions, and any one of such propositions is unexceptionable, the objection must fail.

6. On a separate trial of a criminal jointly indicted with others, such other defendants may be called as witnesses on the part of the state.

---

This case was brought into this court by writ of error from the Essex Oyer and Terminer. The plaintiff in error was indicted with Jeremiah H. Stedwell, Henry W. Baldwin, A. Goodrich Fay, Henry H. Trenor, and Rufus C. Frost, for conspiring to cheat and defraud the New Jersey Mutual Life Insurance Company and William Titus, a policy-holder of said company, of their money, goods and chattels and property, &c.

Argued at June Term, 1879, before BEASLEY, CHIEF JUS-TICE, and Justices VAN SYCKEL and DIXON.

For the plaintiff, *A. Q. Keasbey* and *Cortlandt Parker*.

For the state, *G. N. Abeel* and *John P. Stockton*, *Attorney-General*.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   The indictment in this case is for a conspiracy, and the first position taken before this court by the counsel of the plaintiff in error is, that the indictment itself is bad and insufficient in law.   Stated in brief, the indictment charges that Jeremiah H. Stedwell, Benjamin Noyes, Henry W. Baldwin, A. Goodrich Fay, Henry H. Trenor, and Rufus C. Frost, on the 26th day of January, 1877, did conspire, &c., by divers subtle means and devices to cheat and defraud the New Jersey Mutual Life Insurance Company, a corporation existing by the laws of this state, and William Titus, a policy-holder of said company, of their money, goods and chattels and property, by means of the said Jeremiah H. Stedwell, being then and there a director, member and public officer of said company, then and there knowingly and fraudulently taking and applying to his own use and benefit, and to uses and purposes other than the uses and purposes of the New Jersey Mutual Life Insurance Company, the money, goods and chattels of the said, &c.   The overt act laid is, that said defendants, in pursuance of said conspiracy, did " unlawfully and fraudulently take possession of the office, money, goods, chattels and property of the said New Jersey Mutual Life Insurance Company," &c.

The legal fault imputed to this accusation is, that it is double, inasmuch as it charges the commission by these defendants of two substantive offences.

Even on the assumption of the existence of this alleged defect, how such an exception, taken at this stage of the proceedings for the first time, so far as appears from the record

now before us, is to be made available, it is not easy to understand. Counsel has not explained how the barrier of the statute is to be surmounted in order to enable this point to be raised at this late period. The fifty-third section of the criminal procedure act (*Rev., p.* 277,) says that " every objection to any indictment, for any defect of form or substance apparent on the face thereof, shall be taken by demurrer or motion to quash such indictment, before the jury shall be sworn, and not afterwards;" and it would seem that such provision can never have a more apt or reasonable application than in the exclusion of the present technicality. This objection, if we suppose it to be well founded, was apparent on the face of this indictment, and consequently could be taken, in one of the prescribed forms, only before the swearing of the jury. This position would be a complete answer to the point now sought to be made.

But to avoid any erroneous estimate with respect to the legal value of such point, I will for a moment put it to the test. The duplicity complained of consists, according to the view of counsel, in this : It is asserted that this charge is founded on a combination to commit the crime denounced in the one hundred and fifty-fourth section of the crimes act, which makes it penal for any director, officer or member of a body corporate fraudulently to take or apply for his own use or benefit, or for any use or purpose other than the use or purpose of such body corporate, any of the property of such body corporate. It is argued that this clause describes two distinct offences—first, a fraudulent appropriation of property to the use of the person taking it ; second, a fraudulent appropriation of it to any other purposes than those of the body corporate, and that the criminal charge as here laid is of a fraudulent taking for his own use, as well as for purposes other than those of the company. The indictment does not charge these applications in the disjunctive as in the statute ; but the charge is, that the director applied the property taken to his own use *and* to uses and purposes other than the uses of the company. As the allegation of an application to his

Noyes v. State.

own use necessarily involves an application to uses other than those of the company, the exception is certainly subtle that is founded on any attempted separation of this allegation into distinct parts. But the fundamental fallacy in the position on the part of the defence consists in this, that it confounds the crime, which is the conspiracy, with the objects of the conspiracy. A combination to commit several crimes is a single offence, and the offence can always be laid according to the truth. No matter how many violations of law may be concerted by the confederates, if the concert take place at one time, the crime is single. Therefore in this case, if it were the fact that these conspirators on a single occasion confederated to violate the law in question in two distinct particulars, with respect to such combination, the criminal act was a unit, and it appears as such on the face of this indictment.

This objection must be overruled.

The second exception is one of substance, and has been elaborately argued by counsel in their respective briefs. From the opinion I have formed on this subject, it will not be necessary for me to follow that discussion. The objection thus referred to strikes at the jurisdiction of the court over the offence charged in this record. It is insisted that this conspiracy, if it existed in point of fact, was entered into, and was fully completed as a crime, in the State of New York. There is no dispute regarding the main outlines of the facts in this respect. There was a completed conspiracy effected with respect to the transaction in question in the State of New York. To describe it in a word, the plan projected was to turn over the property and assets of the New Jersey Mutual Life Insurance Company to another company in a manner that was a fraud upon the former corporation. This plan was concocted in New York, and was perfected there by the execution and delivery of an assignment by Mr. Stedwell, the president of the New Jersey Mutual, to the defendant, Mr. Noyes. The defendant was the only one of the conspirators who came in person into this state and performed in this state any act in pursuance of the above-mentioned confederacy.

Granting these to be the whole of the facts to be taken into the account, it might be difficult to sustain, on satisfactory grounds, the judicial jurisdiction of this state over the offence. On such a foundation of facts, the crime having been completely committed in another state, the only incident that could be relied on to draw such crime under the cognizance of our courts, would be the act of this defendant, Noyes, in coming within this state and doing something in furtherance of the conspiracy. And accordingly, this is the jurisdictional feature relied on by the state, the theory being that in whatever place one of the conspirators does an act in furtherance of the common design, the illegal agreement is thereby renewed as to all, and consequently the locality of the crime is by the same means changed as to all. But no authority has been cited in support of this proposition, at least no authority that is apposite. The cases referred to go no further than to hold that this legal intendment, that the act of one confederate is the act of all, will arise where such act is done within the same jurisdiction in which the conspiracy occurred. The principle is one relating to mere venue, and not to international jurisdiction. The leading American decision cited in favor of the rule is that of *People* v. *Mather*, 4 *Wend.* 229, and its entire effect is to assert the rule in the narrow form just defined, the only question in reference to this particular being, whether the crime, having been committed in the state, could be tried in a county in which only one of the conspirators had done some act in pursuance of the common design. Such inquiries appertain obviously to mere form and procedure, and seem to me to have no bearing whatever on that important and delicate subject which regulates the amenability of the citizen of one country, or commonwealth, to the criminal laws of another. The inclination of my mind is opposed to all extensions of such power beyond the field which is already clearly defined. But this court is not called on to settle this question at this time, for in the present case the jurisdiction that was assumed is to be vindicated on legal principles that are deemed unquestionable. I have stated that

the defendant, Noyes, was the only confederate who was actually present in this state prosecuting the scheme of the conspirators.   On that occasion, after having received in New York the assignment of the corporate property, he went to Newark, and there took possession of the office and effects of the company.   But such possession was not acquired by the act of this defendant alone, but, on the contrary, the president of the company, Mr. Stedwell, co-operated in producing such result; this office and the effects in it were in the custody of this latter officer of the company, and through the agency of his clerks he passed this property over, on the occasion in question, to this defendant.   Now, as such clerks were innocent agents, and contributed unconsciously to the effectuation of this conspiracy, the legal effect was that their act in this matter was the act of their superior, whose orders they but obeyed; and therefore, in contemplation of law, such superior officer was as much present in such office as though he had been there and made such transfer in person.   There is no rule of criminal law more thoroughly settled than the principle that where an absentee commits a crime by the hand of an innocent agent, such absentee is liable in the country whose laws are infringed.   And it seems to me that no authority is more fit as an illustration at the present time than that of *Rex* v. *Brisac*, 4 *East* 164, which is cited at great length in the brief of the counsel of the defendant.   It presented the circumstance of a conspiracy entered into at sea between the captain and purser of a ship to cheat the government by means of certain false vouchers, the question being whether the defendants were answerable for such crime in England, in the county of Middlesex, in which county such false vouchers had been presented for payment by an innocent person.   The court, in sustaining the jurisdiction, explains the ground of such conclusion in these words, viz.: "That the delivery of such false vouchers, with such fraudulent intent, in pursuance of a conspiracy for that purpose, is an offence in the place where the vouchers were delivered, is a matter which cannot be doubted, though the conspiracy may have

been in another place. And in the present case, the delivering of the vouchers and the presenting the bills of exchange to the commissioners of the victualing office in Middlesex were the acts of both the defendants, done in the county of Middlesex; I say it was *their* acts, done by them *both*, for the persons who innocently delivered the vouchers were mere instruments in their hands for that purpose; the crime of presenting these vouchers was exclusively their own, as the crime of administering poison through the medium of a person ignorant of its quality would be the crime of the person procuring it to be administered." See also on this subject, *State* v. *Wyckoff*, 2 *Vroom* 65; *State* v. *Carter*, 3 *Dutcher* 499; *People* v. *Adams*, 3 *Denio* 190.

By the application of this established legal rule, it appears impossible to avoid the result that, as an intendment of law, the act of changing the possession of this property from the company to the defendant, Noyes, was the joint act of such defendant and of Mr. Stedwell, who is also a defendant, and that by such joint act the conspiracy was renewed and partly executed in this state, in the county of Essex, and that thus this crime became cognizable by the courts of that locality.

The exception, therefore, taken on this point is not sustainable.

The next alleged error which I will notice is the overruling by the judge at the trial of certain evidence offered by the defendant. In order to be intelligible, it becomes necessary to state certain facts, as they appeared in the proofs.

It has already appeared that the indictment charged a conspiracy to cheat the New Jersey Mutual Life Insurance Company, and in order to sustain this issue the state proved a contract dated January 26th, 1877, procured by these confederates, whereby all the assets and property of this company, including its premium notes, were transferred to the National Capital Company, on an assumption by the latter company of all the policy obligations and current obligations of the former company. This assignment the court held was an application of the property of this company to uses and purposes other

than the uses and purposes of the company, and, consequently, as the fact of such assignment was not in dispute, the only question for investigation by the jury was whether such transfer was fraudulent with respect to the defendant. Among other *indicia* of fraud, the state proved that in the receipt which the defendant, Noyes, signed and gave at the time this property was transferred to him, was an item of United States bonds, of the par value of $87,000. Mr. Stedwell, who was the president of the New Jersey Mutual, and who was jointly indicted with Noyes, was examined as a witness on the part of the prosecution, gave this history of these bonds: He said that when he became president in 1874, a certain person by the name of Frost agreed to furnish $100,000 to represent a guarantee capital, and that the stock of the company therefor was issued to the nominees of Frost, though the certificates were never taken from the stock book, and the bonds were retained by Frost with the understanding that they were to be at the service of the company whenever it should be necessary to exhibit or use them for the purposes of the company. It was shown quite clearly in the case that this arrangement was a mere make-believe, and that Stedwell and Frost never intended these bonds should come into the possession of the New Jersey Mutual. Some time before this assignment and transfer of the assets of this company, just referred to, these bonds were exhibited by Mr. Stedwell to the secretary of state, when making an exhibit to that officer of the assets of the company. On that occasion the secretary of state took down the numbers and denominations of these bonds. Stedwell testified that in his arrangement with Noyes it was agreed that the latter should receipt for these bonds, but that Frost should be allowed to retain them, and that accordingly this agreement was carried into effect at the time of the assignment and transfer of the assets. Stedwell gave this account of that transaction: that when the receipt was given, the defendant, having it before him, he, Stedwell, put down the various papers embraced in it, and that the defendant put them aside on the table, and checked

them off on the receipt, and then signed the receipt. This witness, when asked as to the delivery at that time by him to the defendant of the United States bonds, said : I presented to him a package of bonds which I had received for that purpose, and that the defendant did not open the package at all, but merely pushed it to one side and paid no special attention to it. The witness stated that he had got this package from Mr. Frost, and that he did not know what it contained except from that person's statement to him. The defendant, Noyes, in narrating the details of this occurrence, said that this item of United States bonds was put in the receipt by mistake, and that after he had signed it, he observed the error and pointed it out to Mr. Stedwell, who promised to have it corrected. He also said, in substance, that if such a package as has been described was placed before him, he might have pushed it aside, but he did not remember doing such an act.

In this attitude of the case, the defendant offered to prove that some time prior to the connection of Noyes with any of the affairs of the New Jersey Mutual, the United States bonds which had been exhibited to the secretary of state by Mr. Stedwell as part of the assets of the company, had been sold by certain brokers in New York, and had ceased at that time to be the property of this company. This offer was objected to by the state, and was overruled by the court. It is now urged that this rejection was erroneous in law.

The question therefore is, in what respect, and to what degree, would this rejected evidence have helped the defence ?

It is insisted that if these bonds had been previously sold, then Noyes could not at this subsequent time have co-operated in a cheat upon the company with regard to them. But this is not tenable, for if Frost had sold these bonds, which it is clear *he* at least could not deny were the property of this company, then he owed the company their value, and the receipt would have had the effect of covering up the transaction and of relieving him from the debt. The fraud would have been different only in form, the substance being the same.

Nor do I see the force of that other contention, that if this testimony had been admitted, it would have tended to confirm the statement of Noyes, and to have disproved that of Stedwell. Noyes' account was that he was to receive no United States bonds in this transaction. But this was what the state alleged, its position being that Frost was to retain the bonds and Noyes to receipt for them. Neither would the proof of the previous sale of the bonds have affected the evidence of Stedwell touching the occurrence attendant upon the giving of the receipt, because all he said in that particular was that he placed a package marked "United States bonds" before Noyes at that time. That package was not opened either by him or Noyes, and he expressly declared that he had no personal knowledge as to what it contained. It will be also observed that, whether that package contained the identical bonds that had been presented to the secretary of state, or other substituted bonds, or bits of blank paper, was a matter of no account with reference to the substance of that transaction; for the fraud could as well be, and was as likely to have been, carried out in any one of these ways as by either of the others. The entire affair, so far as concerned the transfer of bonds to Noyes, was a false device and hollow pretence, and the actual presence of bonds was of no importance to it. But as Stedwell did not testify that the package contained bonds to his knowledge, the evidence of the sale of the bonds shown to the secretary of state could not, in any appreciable degree, have diminished the force of his statement. It seems to me the testimony rejected might have been admitted, but it had so feeble a bearing on the point that it was offered for the purpose of elucidating, that it must be considered as belonging to that class of proofs whose admission or rejection lies in the discretion of the judge trying the case.

There is another assignment of errors, on which the counsel of the defendant seems to lay some stress. This complaint is against these clauses in the judge's instruction to the jury. The judge said : " The charge is not that these parties procured the making of the contract the directors of the com-

pany had no power to make. The state cannot ask a conviction on that ground. Hence, the advice of counsel, that such a contract of re-insurance was within the powers of the directors (if any such advice was given), is foreign to the real question in the cause. It is of consequence only incidentally as part of the history of these transactions. The want of power in the directors to make the disposition of the property they did make, is only important to establish the fact that the property of the company was applied to other uses than those of the company; and that is a question to be determined by the judgment of this court, and not by the opinion given by counsel. To a want of power of the directors to apply the company's property as it was applied, the state must prove that which was done by the accused was done with a design to defraud the company. For this purpose, as tending to establish the motives that influenced the accused and prompted their acts, much of the evidence of the case was admitted."

The objection pointed at this instruction is, that, in the language of the assignment of error, "the advice of counsel, proved by the defendant to have been given .by him before doing any of the acts charged, was an important fact to establish the motive that influenced him and prompted his acts."

But it is very clear, and will so appear by a careful inspection of the clauses quoted, that the judge in this part of his instructions was not calling the attention of the jury to the motives of the defendant, but to the question of the legality of this contract. With respect to that point, the jury was told that the advice of counsel was of no concern, because that was a question to be determined by the court "and not by the opinion given by counsel." That the court did not mean to be understood as saying that the advice of counsel was inefficacious in the cause at large for any purpose, is evident from the last clause of the foregoing quotations, in which, referring to the necessity laid upon the prosecution to prove not only an unlawful transfer of the property, but also a design in

the defendant to defraud, the fact is alluded to that much of the testimony has been admitted " to establish the motives that influenced the accused," an expression that seems to have no proper connection with the immediate context, unless it is an allusion to the fact that among such evidence so admitted as evincive of the state of mind of the defendant,.the advice of counsel was to be classed.

This is my understanding of these sentences, reading them in connection with those parts of the charge immediately sequent. The counsel puts a different sense upon them ; and does not such disagreement present, in a shape very distinct, the illegality of an exception of this general character ? No rule regulating the trial of causes is more valuable or more settled than the requirement that an exception to the judicial charge, to be legal, must be explicit. If the exception embraces several legal propositions, and any one of them be unexceptionable, the objection fails. Counsel must put his finger on the erroneous proposition, and thus point the mind of the judge to it; if he challenges any part of the charge in bulk, assigning no reason for such challenge, and a bill is allowed on the point, the risk of any legal ingredient being found in such bulk, is that of the party so excepting. The cases, including several of the decisions of our own courts, are conclusive with respect to this doctrine ; and it therefore needs no discussion or further explanation. In its application to the present exception, it is entirely decisive, for, at the least, most of the propositions contained in that portion of the charge which was objected to, are indisputably correct. If, therefore, any single instruction in this mass should appear to be erroneous, which I have said I do not think is the case, it could not have the effect of avoiding these proceedings. In neither aspect is this assignment of errors well laid.

Again, it is urged that it was error in the court to permit Stedwell, who was jointly indicted with Noyes, to be examined as a witness on the separate trial of the latter.

This question was deliberately considered and decided by this court in the case of *State* v. *Brien*, 3 *Vroom* 414. The

doctrine was incidentally sanctioned in the Court of Errors in the case of *Hunter* v. *State*, 11 *Vroom* 495. I can see no reason why the decision referred to should be disturbed.

Another error alleged is, that the court admitted certain statements made by one Fay against the defendant, when it was not proved that the former was the attorney of the latter, so as to be capacitated to make such statements. But there was evidence with respect to the attorneyship of this person, Stedwell testifying "that he acted in the presence of Noyes as if he was his attorney, and gave him advice in relation to the contract." The question of the relationship of this man to the defendant was thus necessarily for the decision of the jury. In this view, the evidence in question was plainly competent.

The other objections alleged have been examined by me. None of them appear to me to be of sufficient gravity to require discussion, and I shall therefore dispose of them with the general remark that I have found nothing in them that has prevented me from coming to the conclusion that this judgment should be in all things affirmed.